1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID PRIEST,

          Plaintiff,

  v.

BENTLEY, et al.,

          Defendants.

No.  2: 21-cv-0058 TLN KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

I.     Introduction

      Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment. (ECF No. 64.)  For the reasons stated herein, the undersigned recommends that defendants' summary judgment motion be granted.

II.    Legal Standards for Summary Judgment

      Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

         Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

1

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

1 1564, 1575 (9th Cir. 1990).

2   In the endeavor to establish the existence of a factual dispute, the opposing party need not

3 establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

4 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

5 trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

6 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

7 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

8 amendments).

9   In resolving a summary judgment motion, the court examines the pleadings, depositions,

10 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

11 Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

12 255.  All reasonable inferences that may be drawn from the facts placed before the court must be

13 drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa

14 County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not

15 drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from

16 which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

17 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a

18 genuine issue, the opposing party "must do more than simply show that there is some

19 metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

20 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21 trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

22   By contemporaneous notice provided on August 22, 2022 (ECF No. 64-8), plaintiff was

23 advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

24 Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

25 Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

26 ////

27 ////

28 ////

III.     Plaintiff's Claims

This action proceeds on plaintiff's original complaint as to defendants Kuersten and Sanchez.  (ECF No. 1.)  On March 30, 2021, service of process was returned unexecuted on defendant Bentley because he is deceased.  (ECF No. 19.)  On November 3, 2021, defendant Bentley was dismissed pursuant to Federal Rule of Civil Procedure 25.  (ECF Nos. 30, 34.)

Plaintiff alleges that on July 18, 2018, at 1000 hours, plaintiff loaded mattresses onto a flatbed trailer as part of his prison work assignment.  (ECF No. 1 at 3.)  While loading the mattresses, plaintiff fell to the ground, injuring his neck, back and hip.  (Id. at 4.)  The Quad Officer asked if plaintiff was "alright."  (Id.)  Plaintiff responded that he hurt his back.  (Id.)  The Quad Officer refused to file an injury/incident report or refer plaintiff to the medical department for evaluation.  (Id.)

On July 18, 2018, at 1300 hours, plaintiff assisted the facility store manager with the loading/bagging of inmate canteen orders.  (Id.)  This task involved plaintiff using his back muscles.  (Id.)  While performing this task, plaintiff heard his back pop and experienced increasing back pain.  (Id.)

On July 18, 2018, at 2100 hours, plaintiff walked to his housing unit, carrying a bag of canteen items.  (Id.)  Plaintiff fell into an open ditch.  (Id.)  This fall "compounded the earlier back, neck and hip injury."  (Id.)  Correctional Officer Santos helped plaintiff up and escorted plaintiff to his housing unit.  (Id.)

On July 19, 2018, at approximately 0800 hours, plaintiff woke unable to move his legs. (Id. at 5.)  Building staff ignored plaintiff's need for medical attention.  (Id.)  Plaintiff could not report to his job.  (Id.)  At approximately 1600 hours, plaintiff was able to get third watch building staff to call a medical emergency on his behalf.  (Id.)  Plaintiff was taken to CTC for evaluation.  (Id.)  Plaintiff alleges that defendant Sanchez did not perform a physical examination and denied plaintiff's request to be prescribed his daily pain medication.  (Id.)  Plaintiff alleges that he was given a ketorolac injection and returned to his housing unit.  (Id.)

On July 21, 2018, Dr. Bentley prescribed naproxen for pain and ordered an x-ray of plaintiff's lower back.  (Id.)  Plaintiff told Dr. Bentley that he injured his back while loading

4

mattresses.  (Id.)  Dr. Bentley refused to record the cause of plaintiff's back injuries in plaintiff's medical file.  (Id.)  Dr. Bentley told plaintiff that he could only list an injury that was a result of an assault or being hit by a vehicle.  (Id. at 6.)  Dr. Bentley told plaintiff that he believed that plaintiff suffered from getting old.  (Id.)

Plaintiff alleges that on August 3, 2018, Dr. Bentley issued an "erroneous" finding of "no significant interval change or acute osseous abnormality" in his evaluation of plaintiff's x-ray. (Id.)  Plaintiff alleges that he actually suffered from nerve, tissue and muscle damage and an infection in his spine.  (Id.)  Plaintiff alleges that Dr. Bentley also overlooked compound fractures in his T-4, T-5 and T-9.  (Id.)

On September 19, 2018, Dr. Bentley and defendant Kuersten jointly denied plaintiff's request for an MRI.  (Id.)  Plaintiff alleges that Dr. Bentley and defendant Kuersten denied that plaintiff's injuries were caused by his fall from the flatbed truck.  (Id.)

On September 19, 2018, Dr. Bentley refused to document that plaintiff could not stand on his own for longer than a few minutes and that plaintiff needed a wheelchair to travel more than ten feet.  (Id. at 6-7.)  Plaintiff alleges that Dr. Bentley and defendants Kuersten and Sanchez denied his request for a wheelchair.  (Id. at 7.)

On October 11, 2018, plaintiff was seen by Dr. Williams via teleconference.  (Id.) Plaintiff told Dr. Williams that he fell off the flatbed trailer and that his request for an MRI was denied.  (Id.)  Dr. Williams had a nurse perform a physical examination of plaintiff.  (Id.)  Dr. Williams told plaintiff that he would submit a recommendation to Dr. Bentley that plaintiff receive an MRI, asap.  (Id.)  Dr. Williams told plaintiff that once the MRI was done, Dr. Bentley would reschedule plaintiff to have another appointment with Dr. Williams.  (Id.)

On or about October 28, 2018, plaintiff saw Dr. Bentley who had not yet ordered the MRI. (Id. at 8.)  Dr. Bentley told plaintiff that he needed to confer with defendant Kuersten before the order for the MRI could be approved.  (Id.)  Plaintiff did not receive the MRI for another 45 days. (Id.)  Plaintiff alleges that throughout this period, he suffered increasing pain and injuries.  (Id.)

Plaintiff alleges that despite his medical problems, discussed above, no defendant placed a medical hold on plaintiff to prevent his transfer to another institution while plaintiff was in the

5

1  middle of the medical evaluation process.  (Id.)

2      Plaintiff alleges that on November 6, 2018, as a result of defendants' refusal to issue

3  plaintiff a wheelchair, plaintiff fell while walking from the dining hall.  (Id.)  Plaintiff alleges that

4  on November 7, 2018, as a result of defendants' failure to issue plaintiff a wheelchair, plaintiff

5  fell again.  (Id. at 9.)

6      Plaintiff had the MRI on November 23, 2018.  (Id.)  On November 27, 2018, a doctor

7  pulled up plaintiff's medical file and MRI and told plaintiff that he needed an operation because

8  his back was "toast."  (Id.)

9      On December 4, 2018, plaintiff was transferred to the California Substance Abuse

10  Treatment Facility ("SATF").  (Id.)  The mode of transportation was a standard van.  (Id.)  Due to

11  his back problems, plaintiff suffered pain during the transport.  (Id. at 9-10.)  Plaintiff alleges that

12  the van had no wheelchair lift or wheelchair security features.  (Id. at 9.)

13      On December 12, 2018, plaintiff had a spinal operation.  (Id. at 10.)

14      Based on the allegations in plaintiff's complaint, the undersigned finds that plaintiff raises

15  the following claims for alleged violations of his Eighth Amendment right to adequate medical

16  care:  1) on July 19, 2018, defendant Sanchez failed to perform a physical examination of plaintiff

17  and failed to provide adequate pain medication; 2) defendant Kuersten denied plaintiff's request

18  for an MRI; 3) defendants Kuersten and Sanchez denied plaintiff's requests for a wheelchair; and

19  4) defendants Kuersten and Sanchez failed to place a medical hold on plaintiff to prevent his

20  transfer to another institution while plaintiff was in the middle of the medical evaluation process.

21      IV.    Legal Standard for Eighth Amendment Claim Alleging Inadequate Medical Care

22      Where a prisoner's Eighth Amendment claim arises in the context of medical care,

23  including mental health care, the prisoner must allege and prove "acts or omissions sufficiently

24  harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429

25  U.S. 97, 106 (1976).  An Eighth Amendment medical claim has two elements: "the seriousness of

26  the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin

27  v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc.

28  v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

1     A medical need is serious "if the failure to treat the prisoner's condition could result in

2 further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974

3 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include

4 "the presence of a medical condition that significantly affects an individual's daily activities." Id.

5 at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the

6 objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S.

7 825, 834 (1994).

8     If a prisoner establishes the existence of a serious medical need, he must then show that

9 prisoner officials responded to the serious medical need with deliberate indifference. See Farmer,

10 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny,

11 delay, or intentionally interfere with medical treatment, or may be shown by the way in which

12 prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

13 Cir. 1988).

14     Before it can be said that a prisoner's civil rights have been abridged with regard to

15 medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,'

16 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter

17 Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also

18 Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in

19 diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth

20 Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of

21 mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for

22 the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

23     A delay in medical treatment does not violate the Eighth Amendment unless that delay

24 causes further harm. McGuckin, 974 F.2d at 1060.

25     Finally, mere differences of opinion between a prisoner and prison medical staff or

26 between medical professionals as to the proper course of treatment for a medical condition do not

27 give rise to a § 1983 claim. See Toguchi, 391 F.3d at 1058.

28 ////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

V.      Defendants' Evidence

Plaintiff did not file a response to defendants' statement of undisputed facts.  The undersigned herein sets forth defendants' undisputed facts.[1]  (ECF No. 64-7.)  The undersigned does not include defendants' undisputed facts nos. 4-8 as these undisputed facts state allegations in plaintiff's complaint.  The undersigned does not include defendants' undisputed fact no. 31 as it involves a medical opinion that will be discussed in the section below analyzing plaintiff's claims.

In support of the undisputed facts, defendants submitted the declaration of Dr. B. Feinberg.  (ECF No. 64-2.)  The undersigned refers to Dr. Feinberg's declaration herein.

> Undisputed fact No. 1:  At all relevant times, plaintiff was an inmate housed at California State Prison-Solano ("CSP-Solano").  (ECF No. 64-7 at 2 (defendants' undisputed fact no. 1); ECF No. 1 (plaintiff's complaint)).

> Undisputed Fact No. 2:  Defendant D. Sanchez was a Nurse Practitioner at CSP-Solano at all relevant times.  Plaintiff was not on defendant Sanchez's case load and she was not his designated provider.  (ECF No. 64-7 at 2 (defendants' undisputed fact no. 2); ECF No. 64-6 at 1-2 (Sanchez declaration)).

> Undisputed Fact No. 3:  At all relevant times, defendant Kuersten was the Chief Medical Executive at CSP-Solano.  Defendant Kuersten did not serve as the plaintiff's primary care physician; plaintiff's primary care physician was Dr. Bentley.  (ECF No. 64-7 at 2 (defendants' statement of undisputed facts); ECF No. 64-4 at 1-2 (Kuersten declaration)).

> Undisputed Fact No. 9:  On April 17, 2018, plaintiff saw his primary care physician ("PCP") Dr. Bentley for follow-up care of his chronic medical conditions.  Included amongst those conditions was chronic low back pain, managed with ibuprofen tablets, to take as needed for pain, and for which x-rays of the lumbar spine taken one year prior showed mild degenerative changes.  (ECF No. 64-7 at 3 (defendants' undisputed fact no. 9); ECF No. 64-2 at 3 (Feinberg declaration); ECF No. 64-3 at 4-6 (plaintiff's medical records)).

> Undisputed Fact No. 10:  On the evening of July 19, 2018, plaintiff was taken to the Treatment and Triage Area ("TTA") at CSP-Solano by RN Chuksorji complaining that his "back went out," and that when he woke up that morning he could not get out of bed due to severe pain.  Discharge instructions from the TTA, prepared later that evening by RN Fajarado, show that plaintiff was given an injection

---

[1] The undersigned reviewed the records cited with the undisputed facts and finds that they are accurately represented in the undisputed facts.

of Toradol for pain and discharged with a prescription for naproxen to use for the pain, as well as a follow-up appointment with his PCP to occur within five days.   (ECF No. 67-7 at 3 (defendants' undisputed fact no. 10); ECF No. 64-2 at 4 (Feinberg declaration); ECF No. 64-3 at 7-18 (plaintiff's medical records)).

Undisputed Fact No. 11:  On July 23, 2018, Dr. Rohrer entered a post-dated note documenting that on the evening of July 19, 2018, he had received a call from the TTA regarding plaintiff's presentation there with an acute exacerbation of his chronic low back pain.  Dr. Rohrer documented pertinent medical records related to plaintiff's presentation and his treatment plan.  There is nothing in plaintiff's medical records suggesting that defendant Sanchez had any involvement in plaintiff's care on July 19, 2018, and she denies any involvement in his care on that date. (ECF No. 64-7 at 3 (defendants' undisputed fact no. 11); ECF No. 64-2 at 4 (Feinberg declaration); ECF No. 64-6 at 2 (Sanchez declaration); ECF No. 64-3 at 19 (plaintiff's medical record)).

Undisputed Fact No. 12:  On July 23, 2018, plaintiff saw Dr. Bentley for follow-up of the TTA visit.  Dr. Bentley documented that plaintiff presented to the TTA four days prior with an acute flareup of low back pain, and plaintiff reported no history of trauma.  Dr. Bentley prescribed oxcarbazepine (Trileptal), a medication with multiple uses but here used for neuropathic pain, and submitted a referral to physical therapy on behalf of plaintiff.  Dr. Bentley also ordered new x-rays for plaintiff's lumbar spine.  Plaintiff issued no request for a wheelchair and arrived to this appointment in a wheelchair.  (ECF No. 64-7 at 4 (defendants' undisputed fact no. 12); ECF No. 64-2 at 4 (Feinberg declaration); ECF No. 64-3 at 20-22 (plaintiff's medical records)).

Undisputed Fact No. 13:  On July 23, 2018, plaintiff submitted a Health Care Services Request Form 7362 requesting an MRI, as well as work and housing accommodations.   (ECF No. 64-7 at 4 (defendants' undisputed fact no. 13); ECF No. 64-2 at 4 (Feinberg declaration ); ECF No. 64-3 at 23 (Health Care Services Request Form)).

Undisputed Fact No. 14:  On July 31, 2018, plaintiff saw RN Ramirez for the Form 7362.  RN Ramirez documented plaintiff stating that he wanted to make sure that he would be getting an x-ray or an MRI of his back, and RN Ramirez informed him that an x-ray had been ordered for August 3, 2018.   Plaintiff issued no request for a wheelchair, and arrived to this appointment on a wheelchair.  (ECF No. 64-7 at 4 (defendants' undisputed fact no. 14); ECF No. 64-2 at 4 (Feinberg declaration); ECF No. 64-3 at 24-34 (plaintiff's medical records)).

Undisputed Fact No. 15:  On August 3, 2018, x-rays were performed on plaintiff's lumbar spine.  These x-rays showed no significant interval change as compared to plaintiff's prior lumbar spine performed April 20, 2017.  (ECF No. 64-7 at 4 (defendants' undisputed fact no. 15); ECF No. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 35 (plaintiff's medical record)).

9

Undisputed Fact No. 16:  On August 10, 2018, plaintiff saw RN Kromann complaining that his "back pain seems to be much worse since I let another inmate walk on my back to try and help the pain." Plaintiff denied falls or recent back trauma.  Plaintiff's naproxen prescription for pain was renewed, and a follow-up appointment with his PCP was scheduled.  Plaintiff issued no request for a wheelchair and arrived at this appointment in a wheelchair.  (ECF No. 64-7 at 4 (defendants' undisputed fact no. 16); ECF No. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 36-44 (plaintiff's medical records)).

Undisputed Fact No. 17: On August 14, 2018, plaintiff saw RN Kaur complaining that his lower back pain was getting worse.  Plaintiff reported no recent fall.  A follow-up appointment with plaintiff's PCP was scheduled for the next morning.  (ECF No. 64-7 at 4 (defendants' undisputed fact no. 17); ECF No. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 45 (plaintiff's medical record)).

Undisputed Fact No. 18:  On August 15, 2018, plaintiff saw Dr. Bentley for follow-up of his low back pain.  Dr. Bentley noted "patient reports no trauma brought this on he only woke up 1 day with back pain."  Dr. Bentley increased plaintiff's pain medication, extended plaintiff's work accommodations, and noted that plaintiff was "requesting an MRI today and patient advised that is not indicated with the minimal findings on an x-ray."  (ECF No. 64-7 at 5 (defendants' undisputed fact no. 18); ECF No. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 46-47 (plaintiff's medical records)).

Undisputed Fact No. 19:  On August 16, 2018, plaintiff was seen in the TTA by Dr. Scott for worsening right-sided lower back pain.  Dr. Scott prescribe morphine for pain relief.  (ECF No. 64-7 at 5 (defendants' undisputed fact no. 19); ECF no. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 48-49 (plaintiff's medical records)).

Undisputed Fact No. 20:  On August 20, 2018, plaintiff saw Dr. Bentley for follow-up of his TTA visit.  Dr. Bentley diagnosed plaintiff with acute sciatica and requested an MRI of plaintiff's lumbar spine.  Dr. Bentley completed his note at 14:53 p.m. entering it into the electronic medical record.  Plaintiff issued no request for a wheelchair, and arrived to this appointment in a wheelchair.  (ECF No. 64-7 at 5 (defendants' undisputed fact no. 20); ECF No. 64-2 at 5 (Feinberg declaration); ECF No. 64-3 at 50-52 (plaintiff's medical records)).

Undisputed Fact No. 21:  At 14:32 p.m. on August 20, 2018, approximately twenty minutes before completing his note above, Dr. Bentley submitted his electronic request for an MRI.  This request was reviewed by Utilization Management RN DeLa Vega.  In her RN review comments on the MRI request, RN DeLa Vega included a quote from Dr. Bentley's most recent note in the electronic medical record, which at that moment was from August 15, 2018, documenting that "patient advised that MRI is not indicated with the minimal findings on an x-ray."  RN DeLa Vega completed her note at 14:54 PM, entering it into the electronic medical record a minute before Dr. Bentley's contemporaneous note.  (ECF No. 64-7 at 5 (defendants' undisputed fact no. 21); ECF No. 64-2 at 6 (Feinberg

declaration); ECF No. 64-3 at 53-54 (plaintiff's medical records)).

Undisputed Fact No. 22:  On August 22, 2018, defendant Kuersten denied the MRI request, referencing the Utilization Management RN comments that the request did not meet the criteria for that service. (ECF No. 64-7 at 5 (defendants' undisputed fact no. 22); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 53); ECF No. 64-4 at 2-3 (declaration of defendant Kuersten); ECF No. 64-3 at 53 (plaintiff's medical record)).

Undisputed Fact No. 23:  On September 19, 2018, plaintiff saw Dr. Bentley for a follow-up of his low back pain.  Plaintiff reported he was "somewhat improved but not much."  Dr. Bentley submitted a request for plaintiff to be seen by Physical Medicine and Rehabilitation (also known as Physiatry) specialist Dr. Williams. Plaintiff issued no request for a wheelchair and arrived to this appointment in a wheelchair.  (ECF No. 64-7 at 6 (defendants' undisputed fact no. 23); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 55-57 (plaintiff's medical records)).

Undisputed Fact No. 24:  On September 20, 2018, defendant Kuersten approved the request for consultation with Dr. Williams. (ECF No. 64-7 at 6 (undisputed fact no. 24); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 58-59 (plaintiff's medical records); ECF No. 64-4 at 3 (declaration of defendant Kuersten)).

Undisputed Fact No. 25:  On September 25, 2018, plaintiff saw Dr. Bentley to discuss pain management for his low back pain.  Dr. Bentley made changes to plaintiff's pain medication regimen. Plaintiff issued no request for a wheelchair, and arrived to this appointment in a wheelchair.  (ECF No. 64-7 at 6 (defendants' undisputed fact no. 25); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 60-61); ECF No. 64-3 at 60-61 (plaintiff's medical records)).

Undisputed Fact No. 26:  On October 11, 2018, plaintiff saw Dr. Williams for a Physical Medicine and Rehabilitation consultation. Documentation in Dr. Williams' note pertinent to the current complaint is that plaintiff reported having a wheelchair and a walker, and that he had had no falls.  Dr. Williams recommended an MRI. (ECF No. 64-7 at 6 (defendants' undisputed fact no. 26); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 62-64 (plaintiff's medical records)).

Undisputed Fact No. 27:  On October 25, 2018, plaintiff saw Dr. Bentley for follow-up of his consultation with Dr. Williams.  Per Dr. Williams' recommendation, Dr. Bentley submitted a request for an MRI of plaintiff's lumbar spine.  Plaintiff stated he was able to use his walker for short distances and no longer needed to use his wheelchair all of the time.   Plaintiff issued no request for a wheelchair, and arrived to this appointment in a wheelchair.  (ECF No. 64-7 at 6 (defendants' undisputed fact no. 27); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-3 at 65-67 (plaintiff's medical records)).

Undisputed Fact No. 28:  On October 26, 2018, defendant Kuersten approved the request for an MRI of plaintiff's lumbar spine based on the findings and recommendations of Dr. Williams and the lack of improvement of the patient's symptoms over a period of time.  (ECF No. 64-7 at 6 (undisputed fact no. 28); ECF No. 64-2 at 6 (Feinberg declaration); ECF No. 64-4 at 3 (declaration of defendant Kuersten); ECF No. 64-3 at 68-69)).

Undisputed Fact No. 29:  On November 7, 2018, plaintiff was seen in the TTA by Dr. Scott complaining of acute low back pain after a fall the prior day.  Plaintiff made no statements that he was in possession of a wheelchair or that he attributed his fall to not being in possession of a wheelchair.  Plaintiff issued no request for a wheelchair, and arrived to the TTA in a wheelchair.  (ECF No. 64-7 at 7 (defendants' undisputed fact no. 29); ECF No. 64-2 at 7 (Feinberg declaration); ECF No. 64-3 at 70-71 (plaintiff's medical records)).

Undisputed Fact No. 30:  Defendant Sanchez had no involvement in plaintiff's care on July 19, 2018, the date plaintiff was allegedly denied pain medication.  (ECF No. 64-7 at 7 (defendants' undisputed fact no. 30); ECF No. 64-6 at 2 (declaration of defendant Sanchez)).

Undisputed Fact No. 32:  Plaintiff never requested a wheelchair from either defendant Sanchez or defendant Kuersten, and neither defendant denied a request for a wheelchair.  From July through November 2018, plaintiff was consistently documented to be utilizing a wheelchair.  In the appointment with Dr. Williams on October 11, 2018, plaintiff reported that he had a wheelchair.  (ECF No. 64-7 at 7 (defendants' undisputed fact no. 32); ECF No. 64-6 at 2 (Sanchez declaration); ECF No. 64-4 at 3 (Kuersten declaration); ECF No. 64-2 at 8 (Feinberg declaration); ECF No. 64-3 at 62 (plaintiff's medical record)).

Undisputed Fact No. 33:  On December 4, 2018, plaintiff transferred from CSP-Solano to SATF for custody rather than medical indications.  Defendants had no subsequent involvement in plaintiff's care.  (ECF No. 64-7 at 7 (defendants' undisputed fact no. 33); ECF No. 64-2 at 7 (Feinberg declaration); ECF No. 64-3 at 72-74).

VI.   Discussion

   A.   Defendant Sanchez's Alleged Failure to Provide Adequate Medical Care on July 19, 2018

        Plaintiff alleges that on July 19, 2018, defendant Sanchez failed to perform a physical examination of plaintiff and failed to provide adequate pain medication.  Defendants move for summary judgment as to this claim on the grounds that it is undisputed that defendant Sanchez was not involved with plaintiff's care on July 19, 2018.  (ECF No. 64-1 at 15).  In his opposition, plaintiff does not dispute that defendant Sanchez was not involved with his care on July 19, 2018.

1   (ECF No. 67.)

2          The undersigned finds that defendants' undisputed evidence demonstrates that defendant

3   Sanchez was not involved with plaintiff's care on July 19, 2018.  For this reason, defendant

4   Sanchez should be granted summary judgment as to this claim.

5                  B.   Alleged Denial of Requests for Wheelchair

6          Plaintiff alleges that defendants Sanchez and Kuersten denied his requests for a

7   wheelchair.  Defendants move for summary judgment as to this claim on the grounds that there is

8   no evidence that plaintiff ever requested a wheelchair from defendants.  (ECF No. 64-1 at 17.)

9   Defendants also argue that there is no evidence that either defendant denied plaintiff's request for

10  a wheelchair.  (Id.)  Defendants contend that it was consistently documented in plaintiff's medical

11  records during the relevant time period that plaintiff possessed and used a wheelchair, including

12  arriving to medical appointments in a wheelchair.  (Id.)

13         In his opposition, plaintiff argues that there was no rule that he make a request for a

14  wheelchair, especially when the need was obvious, as in plaintiff's case.  (ECF No. 67 at 8.)

15         The undersigned finds that defendants' undisputed evidence demonstrates that plaintiff

16  did not request a wheelchair from defendants and that defendants did not deny plaintiff a

17  wheelchair.  Defendants' undisputed evidence demonstrates that plaintiff consistently appeared at

18  medical appointments in a wheelchair.  Based on this undisputed evidence, the undersigned finds

19  that plaintiff's claim alleging that defendants Sanchez and Kuersten denied his requests for a

20  wheelchair, or otherwise failed to provide him with a wheelchair, is unsupported.  Accordingly,

21  defendants should be granted summary judgment as to this claim.

22                 C.   Defendant Kuersten's Denial of First Request for an MRI

23         Defendants argue that defendant Kuersten did not act with deliberate indifference on

24  August 22, 2018, when he denied Dr. Bentley's first request for plaintiff to receive an MRI.

25  Defendants argue that defendant Kuersten denied the MRI request because he agreed with the

26  Utilization Management Nurse's review, who noted Dr. Bentley's record stating that "MRI is not

27  indicated with the minimal findings on the x-ray." (ECF No. 64-1 at 16.)  Defendants argue that

28  plaintiff was being evaluated by his primary care provider, to whom defendant Kuersten could

1  legitimately defer concerning necessary tests for plaintiff's back condition.  (Id.)  Defendants

2  argue that plaintiff's belief that a different course of treatment should have been followed (i.e.,

3  that he should receive an MRI despite the observations by his primary care physician) does not

4  amount to deliberate indifference.  (Id.)

5  Defendants go on to argue that defendant Kuersten later approved the request for an MRI

6  made after plaintiff's examination by Dr. Williams.  (Id. at 17.)  Defendants argue that after

7  learning about plaintiff's condition from the specialist's examination, including a request that

8  plaintiff receive an MRI from a specialist and the lack of improvement of plaintiff's symptoms

9  over a period of time, defendant Kuersten approved an MRI for plaintiff on October 26, 2018.

10  (Id.)

11  At the outset, the undersigned finds that because defendant Kuersten approved the second

12  request for an MRI, plaintiff is alleging a delay in medical care.  A delay in medical treatment

13  does not violate the Eighth Amendment unless that delay causes further harm.  McGuckin, 974

14  F.2d at 1060.  Because plaintiff continued to suffer back pain between the denial of the first

15  request for an MRI and the approval of the second request for an MRI, plaintiff demonstrates

16  harm caused by the delay.

17  The undersigned also observes that the parties dispute the cause of plaintiff's back pain.

18  Plaintiff alleges that his fall from the flatbed truck while loading mattresses caused the pain.

19  Defendants contend that plaintiff woke up in pain.  The undersigned finds that there is no

20  evidence that defendant Kuersten knew of plaintiff's alleged fall.  Plaintiff's medical records

21  stated that plaintiff woke up in pain.  For these reasons, plaintiff has not shown that the cause of

22  his back pain is a materially disputed fact with regard to his claim against defendant Kuersten.

23  To put defendant Kuersten's decision denying the first request for an MRI in context, the

24  undersigned discusses plaintiff's relevant medical records in more detail herein.

25  Dr. Bentley's notes from his August 15, 2018 examination of plaintiff state that plaintiff

26  complained of lower back pain and was tearful as a result of the pain.  (ECF No. 64-3 at 46.)  Dr.

27  Bentley wrote that plaintiff had, "Bilateral radicular sciatic low back pain."  (Id.)  Dr. Bentley

28  wrote that plaintiff arrived in a wheelchair because he could not walk long distances.   (Id.)  Dr.

14

1 Bentley denied plaintiff's request for an MRI because "it is not indicated due to minimal finding

2 on an x-ray." (Id.)

3     On August 16, 2018, Dr. Scott saw plaintiff. (Id. at 48.) Dr. Scott reported that plaintiff

4 complained of worsening right low back pain radiating down his right leg at 10/10. (Id.) Plaintiff

5 reported numbness from right hip to knee. (Id.) Plaintiff was unable to walk due to pain. (Id.)

6 Dr. Scott found that plaintiff had acute sciatic and lower back pain. (Id.) Dr. Scott prescribed

7 morphine for plaintiff. (Id. at 48-49.)

8     On August 20, 2018, plaintiff saw Dr. Bentley. (Id. at 50-52.) Plaintiff reported

9 worsening low back pain and sciatic pain. (Id. at 50.) Dr. Bentley wrote, "Patient with the same

10 right greater than left low back pain x 4 weeks." (Id.) Dr. Bentley wrote that plaintiff had "acute

11 right GT left bilateral radicular sciatic low back pain; current flareup started 4 wks ago in 2018

12 July 18; no trauma; patient reports that he simply woke up with the pain on that day." (Id.) Dr.

13 Bentley wrote that plaintiff was wheelchair dependent. (Id.) Dr. Bentley wrote, "Lumbar x-ray

14 2018 August 3 w mild DJD w stable L2-3 disc height loss." (Id.) Dr. Bentley also noted the

15 results of the April 20, 2017 x-ray. (Id. at 51.) Dr. Bentley requested a "Lumbar MRI with and

16 without contrast: Request submitted today for 2 week (urgent) imaging." (Id.) Dr. Bentley also

17 described the pain medication plaintiff had been prescribed, including morphine. (Id. at 50-51.)

18     The document containing defendant Kuersten's denial of Dr. Bentley's first request for an

19 MRI contains RN DeLa Vega's comments: "no documentation of suspected herniation, stenosis,

20 cauda equina, suspected fracture. PCP documented, 'patient advised that MRI is not indicated

21 with the minimal findings on an x-ray.'" (Id. at 53.) The document states that defendant

22 Kuersten denied the request for the MRI because, "Criteria not met. See UM-RN comments."

23 (Id.) The document stated that plaintiff's primary diagnosis was degeneration of lumbar or

24 lumbosacral intervertebral disc (M51.37) with a secondary diagnosis of lower back pain. (Id.)

25 The document noted that plaintiff was wheelchair dependent, had difficulty getting to the chow

26 hall and pill line and that clinical indications were "acute right GT left bilateral radicular sciatic

27 low back pain." (Id.) The document also stated that plaintiff's flareup started four weeks ago.

28 (Id.) The document describes the "priority" of the request for the MRI as "routine." (Id.)

As indicated in defendants' undisputed fact no. 21, when Nurse DeLa Vega prepared her comments regarding the first MRI request, Dr. Bentley's notes from his August 20, 2018 examination of plaintiff had not been entered into the electronic records.  For this reason, Nurse DeLa Vega's comments are apparently based on her review of Dr. Bentley's notes from his August 15, 2018 examination of plaintiff where he found no MRI indicated.

On October 26, 2018, defendant Kuersten granted Dr. Bentley's second request for plaintiff to receive an MRI.  (Id. at 68.)  In this document, RN DeLa Vega again found that plaintiff did not meet the criteria to receive an MRI:  "no criteria for discogenic impairment (bilateral sxs) compressing spinal roots."  (Id.)  Defendant Kuersten disagreed with Nurse DeLa Vega's finding and approved the request.  (Id.)  This document noted that plaintiff's primary diagnosis was degeneration of lumbar or lumbosacral intervertebral disc (M51.37).  (Id.)  This document noted that plaintiff had radicular sciatic low back pain.  (Id.)  This document also noted plaintiff's consultation with Dr. Williams.  (Id.)

In his declaration, defendant Kuersten discussed his decisions to grant and deny the requests for plaintiff to receive an MRI:

> 5.  On August 22, 2018, I performed an administrative secondary review of a Request for Services submitted by Dr. Bentley for a lower back MRI for plaintiff.  The request had already been subject to a primary review by our UM (utilization management) nurse and did not meet the criteria for that service.  I concurred with the primary review result by the UM nurse as there was no information submitted by Dr. Bentley that supported a medical necessity for a lower back MRI at that time.  Indeed, Dr. Bentley stated in his own record dated August 15, 2018 that an MRI was not indicated.  My review of the Request for Services was performed timely, the determinations were based on medical information and established criteria and my decision was not made with any malicious intent or in disregard of plaintiff's health.
>
> ***
>
> 7.  On October 26, 2018, I performed another administrative secondary review of a Request for Services submitted by Dr. Bentley for a lower back MRI for plaintiff.  The MRI review by the UM nurse had determined that the request did not meet criteria.  However, based on the findings and recommendations of the physiatrist and the lack of improvement of the patient's symptoms over a period of time, I approved the request.  I believed that an MRI at that time would assist the primary care provider gain further information regarding plaintiff's condition.

16

(ECF No. 64-4 at 2-3.)

In his declaration, Dr. Feinberg opines that defendant Kuersten appropriately denied Dr.

Bentley's first request for plaintiff to receive an MRI:

> 32.  Based upon my review of the medical records, my training and experience, it is my professional opinion that plaintiff's claim that Dr. Kuersten improperly denied a request for an MRI is not supported by the medical record.  It was reasonable and medically sound for Dr. Kuersten to deny the MRI request on August 22, 2018. The information Dr. Kuersten was provided by the Utilization Management RN showed that the PCP submitting the MRI request, who had personally seen and assessed plaintiff, had documented informing plaintiff that an MRI was not indicated.  This was very useful and clinically relevant information, and appropriate for the Utilization Management RN to highlight.  It is not uncommon in medical practice for a physician to inform a patient that a test such as an MRI is not clinically indicated, and have the patient become insistent that the physician nonetheless request the study.  Faced with that scenario, many physicians will choose to order the study, assuming they do not feel it would harm the patient, while documenting that they were aware that the study was not clinically indicated and had informed the patient as much.  That appeared to be the scenario that Dr. Kuersten was presented with when reviewing the MRI request, and he responded appropriately by denying the request.

(ECF No. 62-2 at 7.)

Attached to plaintiff's opposition is a record from his December 12, 2018 back surgery.

(ECF No. 67 at 22-23.)  The report states, in relevant part,

> Imaging shows advanced osteodiscitis with kyphosis, severe cord compression and extensive cord signal changes at the T9 level and then a dorsal epidural abscess extending up to T7.  Decompression is indicated to facilitate treatment, prevent ascension of his sensory level and fusion to provide stability and help to correct some of the deformity.

(Id. at 22.)

Although not explicitly stated in the record, it is clear that the only information defendant

Kuersten reviewed when considering the first MRI request was the information in the document

containing his decision denying the request.  As discussed above, in this document, Nurse DeLa

Vega erroneously referred to Dr. Bentley's notes from his August 15, 2018 examination of

plaintiff where he found no MRI indicated.

////

17

1    The undersigned finds that defendant Kuersten did not act with deliberate indifference

2    when he denied the first MRI request because the request was not supported by information

3    demonstrating that the MRI was a medical necessity.  In denying the request, defendant Kuersten

4    deferred to the opinion of plaintiff's primary care provider Dr. Bentley, as reflected in Nurse

5    DeLa Vega's comments, that the MRI was not indicated.  Defendant Kuersten was not aware of

6    the records from Dr. Bentley's August 20, 2018 examination of plaintiff.  Defendant Kuersten did

7    not knowingly disregard an excessive risk to plaintiff's health when he denied the first MRI

8    request.[2]  See Toguchi v. Chung, 391 F.3d 1051, 1057-60 (9th Cir. 2004) (holding that deliberate

9    indifference is a high legal standard and a prison official is deliberately indifferent only if he or

10   she knows of and disregards an excessive risk to inmate health).

11   Although defendant Kuersten could have reviewed plaintiff's relevant medical records in

12   evaluating the first MRI request, his failure to review plaintiff's relevant medical records does not

13   rise to deliberate indifference.  See Renfro v. Clark-Barlow, 2019 WL 4670250, at *7 (E.D. Cal.

14   2019) (defendant's failure to review plaintiff's medical does not rise to Eighth Amendment

15   claim); Palomino v. Mindoro, 2018 WL 5845707, at * 1 (N.D. Cal. Nov. 5, 2018) ("A failure to

16   review an inmate's health record, without an allegation that defendant was aware of facts from

17   which it could be inferred that a substantial risk of harm existed, amount only to negligence.");

18   Cottingham v. Nangalama, 2012 WL 1981452 at *3 (E.D. Cal. June 1, 2012) (a prisoner's

19   allegation that a defendant doctor was deliberately indifferent for failing to review plaintiff's

20   medical records dismissed because it stated nothing more than a negligence claim).

21   In his declaration, Dr. Feinberg opines that defendant Kuersten likely believed that Dr.

22   Bentley submitted the first MRI request, despite finding no MRI indicated, in order to placate

23   plaintiff.  The undersigned is not persuaded by Dr. Feinberg's speculation regarding defendant

24   Kuersten's state of mind because defendant Kuersten, himself, did not address this matter in his

25   own declaration submitted in support of the summary judgment motion.  Nevertheless, for the

26   _____

27   [2] Presumably, Dr. Bentley reviewed the document containing defendant Kuersten's decision
     denying the first MRI request.  Defendant Kuersten's decision was clearly based on Dr. Bentley's

28   notes from his August 15, 2018 examination of plaintiff.  It is unclear why Dr. Bentley did not
     immediately resubmit a properly supported request.

1  reasons discussed above, the undersigned finds that Kuersten did not act with deliberate
2  indifference in denying the first MRI request.

3      In his opposition, plaintiff also argues that defendants misdiagnosed him with strained
4  muscles and degenerative spine disease.  (ECF No. 67 at 3.)  Plaintiff presents no evidence
5  supporting this claim.  As discussed above, defendant Kuersten did not physically examine
6  plaintiff in reviewing the first MRI request.  The record contains no evidence demonstrating that
7  defendant Kuersten diagnosed the cause of plaintiff's back pain.[3]  For these reasons, plaintiff has
8  not demonstrated a disputed material fact based on defendant Kuersten's alleged misdiagnosis of
9  his back pain.

10      Accordingly, for the reasons discussed above, defendant Kuersten should be granted
11  summary judgment as to this claim.

12          D.  Qualified Immunity

13      *Legal Standard*

14      Government officials enjoy qualified immunity from civil damages unless their conduct
15  violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910
16  (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is
17  presented with a qualified immunity defense, the central questions for the court are: (1) whether
18  the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the
19  defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue
20  was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v.
21  Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in
22  sequence).  "Qualified immunity gives government officials breathing room to make reasonable
23  but mistaken judgments about open legal questions."  Ashcroft v. al-Kidd, 563 U.S. 731, 743
24  (2011).  The existence of triable issues of fact as to whether officials were deliberately indifferent

25  ─────────────────

26  [3]  To the extent plaintiff argues that defendant Sanchez misdiagnosed the cause of his back pain,
    there is no evidence that defendant Sanchez treated plaintiff on July 19, 2018, i.e., the date of the
27  alleged deprivation.  For this reason, plaintiff's claim that defendant Sanchez misdiagnosed the
    cause of his back pain does not create a disputed material fact regarding his claims against
28  defendant Sanchez.

1   does not necessarily preclude qualified immunity.  Estate of Ford v. Ramirez-Palmer, 301 F.3d

2   1043, 1053 (9th Cir. 2002).

3         "For the second step in the qualified immunity analysis—whether the constitutional right

4   was clearly established at the time of the conduct—the critical question is whether the contours of

5   the right were 'sufficiently clear' that every 'reasonable official would have understood that what

6   he is doing violates that right.'"  Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (quoting

7   al-Kidd, 563 U.S. at 741) (some internal marks omitted).  "The plaintiff bears the burden to show

8   that the contours of the right were clearly established."  Clairmont v. Sound Mental Health, 632

9   F.3d 1091, 1109 (9th Cir. 2011). "Whether the law was clearly established must be undertaken in

10  light of the specific context of the case, not as a broad general proposition."  Estate of Ford, 301

11  F.3d at 1050 (citation and internal marks omitted).

12        *Discussion*

13        Defendants argue that they are entitled to qualified immunity as to the three claims

14  discussed above.  Because the undersigned finds no constitutional violation regarding these

15  claims, the undersigned need not further address qualified immunity.

16             E.   Remaining Claim

17        Plaintiff alleges that defendants failed to place a medical hold on plaintiff to prevent his

18  transfer to another institution while plaintiff was in the middle of the medical evaluation process,

19  i.e., awaiting the results of the MRI.  While defendants address this issue in the reply to plaintiff's

20  opposition, they did not move for summary judgment as to this claim.  Defendants are granted

21  thirty days to file a supplemental summary judgment motion addressing this claim.

22        Accordingly, IT IS HEREBY ORDERED that defendants are granted thirty days from the

23  date of this order to file a supplemental summary judgment motion addressing plaintiff's claim

24  that they failed to place a medical hold; and

25        IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

26  No. 64) granted.

27        These findings and recommendations are submitted to the United States District Judge

28  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 1, 2022

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Priest58.sj(2)